DECISION
Heath Management Company, Inc. ("Heath" or "Plaintiff") appeals a decision of the Rhode Island Department of Environmental Management ("RIDEM" or "Defendant") adopting a Recommended Final Agency Order ("Order" or "Decision") issued by its Administrative Adjudicative Division ("AAD"). That Order denied Plaintiff's Petition for a Declaratory Ruling ("Petition") seeking a finding that it was the owner of real estate identified as Bonnet Shores Beach Club, 175 Bonnet Point Road, Assessor's Plat N-S, Lots 631, 632, and 633 in the land evidence records of the Town of Narragansett ("Bonnet Shores" or the "property"). Jurisdiction is pursuant to G.L. 1956 §§ 42-35-8 and 42-35-15. For the reasons set forth herein, Plaintiff's appeal is denied.
 FACTS AND TRAVEL
In January 1988, Seaside Realty Trust ("Seaside"), a Massachusetts Nominee Trust, owned Bonnet Shores in fee simple and converted the property to a condominium form of ownership pursuant to G.L. 1956 §§ 34-36-1 et seq. and 34-36.1-1 etseq., commonly referred to as the Rhode Island Condominium Act ("Condominium Act").[1] As part of the conversion process, Seaside applied to RIDEM for a permit relative to the installation of an individual sewage disposal system ("ISDS").
RIDEM is authorized by the Rhode Island General Assembly "[t]o establish minimum standards . . . relating to the location, design, construction and maintenance of all sewage disposal systems." G.L. 1956 § 42-17.1-2(1). To that end, the agency established Rules and Regulations Establishing Minimum StandardsRelating To Location, Design, Construction and Maintenance ofIndividual Sewage Disposal Systems ("ISDS Rules" or "ISDS Regulations").[2] Pursuant to its statutory authority, RIDEM issued a permit to Seaside expressly limiting to 1069 the number of condominium units to be developed at Bonnet Shores. (Memorandum of Law in Support of Heath's Petition for Declaratory Ruling at 1.)
Within the Declaration of Condominium of Bonnet Shores Beach Club Condominium ("Declaration") — and of particular import with respect to the instant proceeding — Seaside reserved for itself, and for its successors, the right to develop additional units at Bonnet Shores. Article 20 of the Declaration defined said reserved interest as follows:
 "Special Declarant Rights means those rights described in this Declaration reserved for the benefit of the Declarant including the rights to (i) complete improvements on plats and plans filed with the Declaration, (ii) to maintain sales offices, management offices, signs advertising the Condominium and models, and exercise Development Rights." (Declaration at 53) (emphasis added.)
In addition to the definitions set forth in the Declaration, the rights reserved by Seaside were also defined by the applicable provisions of the Condominium Act.[3] Essential to the resolution of the instant dispute, both the Condominium Act and the Declaration are silent as to the status of the property interest the declarant held relative to that property subject to said development rights prior to the exercise of that right. In June 1997, Heath succeeded Seaside as the declarant, and, consequently, as the holder of the special declarant right to develop the additional units.
As of October 2001, 938 condominium units existed at Bonnet Shores. At that time, RIDEM received complaints that the septic system connected with the property was responsible for high bacteria levels in the adjacent beach water. (Oct. 3, 2001 Letter from David E. Chopy, P.E., RIDEM Supervising Sanitary Engineer, to Joseph Mignano, President, Bonnet Shores Beach Club Association ("Association" or "Defendant").) The RIDEM Office of Compliance and Inspection ("OCI") investigated and discovered that Bonnet Shores' ISDS was not functioning properly and was in violation of RIDEM Regulations. On October 3, 2001, OCI issued to the Association, in its capacity as owner of the property, a Notice of Intent to Enforce highlighting the violations and directing the Association to submit an application to the RIDEM Office of Water Resources ("OWR") containing a remedial plan.[4]
In accordance with the Notice of Intent to Enforce, the Association submitted a plan to OWR for a replacement ISDS. For approximately three years, the Association and OWR worked together to design a system that would bring Bonnet Shores into compliance with the ISDS Regulations. On or about July 20, 2004, OWR issued a new permit approving an ISDS structure to be located beneath a portion of the property that served as a parking area for the unit owners, a designated "common element" of Bonnet Shores.[5] The permit was specifically limited to accommodate only 930 condominium units.[6]
The permit, which was issued to the Association, and not to Plaintiff, precluded Plaintiff from further developing the property. On September 21, 2004, Plaintiff filed a timely appeal to RIDEM requesting an adjudicatory hearing.[7] Subsequent to filing its appeal, Heath petitioned RIDEM under the auspices of G.L. 1956 § 42-35-8 for a declaratory ruling that, along with the Association, it, too, was an "owner" of Bonnet Shores.[8]
Heath maintained that the Association's application and the RIDEM-issued ISDS permit were invalid absent Plaintiff's signature. Plaintiff noted that the ISDS permit in effect at the time it succeeded to its interest in the property allowed the declarant to develop 1069 units, not merely 930 units. Thus, argued Plaintiff, the new permit effectively precluded it from exercising its special declarant right to develop the additional units.[9]
The RIDEM Director forwarded Plaintiff's Petition to the Chief Hearing Officer of AAD ("hearing officer") for oral argument and a recommended decision. (See Feb. 11, 2005 Order Transmitting Administrative Record to Chief Hearing Officer.) On May 13, 2005, AAD denied the Petition, finding that Heath, as holder of special declaratory rights under a declaration of condominium, was not an "owner" of Bonnet Shores as that term is used in the ISDS regulations. (Order at 9.) On May 24, 2005, the RIDEM Director adopted the Order.[10] Consequently, RIDEM determined that Heath's signature was not required to validate either the application to OWR or the resulting permit. (Order at 9.)
The AAD hearing officer provided the bases for her determination. She first referred to the ISDS Regulations which contained the following definition of "owner":
 "[A]ny person who alone, or jointly or severally with others: (a) holds legal title to any real property; or (b) has possession or control of any real property through any agent, executor, executrix, administrator, administratrix, trustee or guardian of the estate of a holder of a legal title or has possession or control through any lease or purchase and sale agreement. Each such person is bound to comply with the provisions of these rules and regulations." (ISDS Regulations at 6.)
Because Heath was not alleging "possession or control" of the property "through any agent, executor, executrix, administrator, administratrix, trustee or guardian," the AAD hearing officer considered only whether Heath could properly claim "legal title" of Bonnet Shores. Noting that "Black's Law Dictionary . . . recognizes legal title to be that which is complete and perfect regarding the apparent right of ownership and possession," (Order at 6) AAD found that "[a]n interpretation which excludes the holder of an equitable future interest is consistent with the common meaning and usage of the term `legal title.'" Id.
Therefore, the hearing officer concluded that Heath did not possess an interest in the property sufficient to confer "legal title" as defined by the ISDS regulations.
Next, she pointed to the Condominium Act, which defines a "[u]nit owner" as "the person or persons owning a unit in fee simple and an undivided interest in the fee simple estate of the common areas and facilities in the percentage specified and established in the declaration." Sec. 34-26-3(18). Accordingly, the hearing officer concluded that Heath's "future rights to the units and common areas" can be distinguished from the "present possessory rights" of all unit owners. (Order at 7.) As such, she defined Plaintiff's interest in Bonnet Shores as an "equitable interest which does not rise to the level of `legal title' as it is commonly used." Id. Finally, the hearing officer considered policy concerns and concluded that RIDEM's responsibility to approve, permit, and license sewage disposal systems "would be frustrated by the broad interpretation of owner urged by [plaintiff]." Id. Furthermore, she stressed that, contrary to Heath's assertions, the new permit does not foreclose the development of additional units but rather "the restrictions placed in the approved permit may be relaxed in the future . . . upon application with appropriate engineering design and review and approval." Id. at 8.
As previously noted, RIDEM adopted the AAD Order denying the Petition. Heath then filed the instant appeal to the Superior Court requesting that the Decision be reversed.[11] The Association subsequently filed a motion to intervene as a matter of right pursuant to Super. Ct. R. Civ. P. 24(a)(2) which was granted by a Superior Court justice.[12]
 STANDARD OF REVIEW
The Superior Court's review of an administrative agency decision is governed by § 42-35-15, which provides the following:
 "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
This Court must review the record to determine whether the administrative decision was predicated upon "legally competent evidence" Envl. Scientific Corp. v. Durfee, 621 A.2d at 208
(citing Barrington Sch. Comm. v. Rhode Island State LaborRelations Bd., 608 A.2d 1126, 1138 (R.I. 1992)). Competent or substantial evidence is that which a reasonable mind might accept to support a conclusion. Caswell v. George Sherman Sand GravelCo., 424 A.2d 646, 647 (R.I. 1981). Questions of law are reviewed by this Court de novo. Narragansett Wire Co. v.Norberg, 118 R.I. 596, 376 A.2d 1, 16 (1977).
When an administrative agency endeavors to interpret its own rules or regulations, said interpretation is entitled to great deference on appeal. Gallison v. Bristol Sch. Comm.,493 A.2d 164, 166 (R.I. 1985); see also Martin v. Occupational Safetyand Health Review Comm'n, 499 U.S. 144, 150 (1991) ("[a]n agency's construction of its own regulations is entitled to substantial deference"); Pawtucket Power Assocs. Ltd. P'ship v.City of Pawtucket, 622 A.2d 452, 456 (R.I. 1993) ("deference will be accorded to an administrative agency when it interprets a statute whose administration and enforcement have been entrusted to the agency . . . even when the agency's interpretation is not the only permissible interpretation that could be applied."). Admittedly, this deference is not so absolute that it resembles "blind allegiance." Citizens Sav. Bank v. Bell,605 F. Supp. 1033, 1042 (D.R.I. 1985). Rather, "[t]he true measure of the deference due depends on the persuasive power of the interpretation, given the totality of the attendant circumstances." Id. (citing Skidmore v. Swift Co.,323 U.S. 134, 140 (1944); Mayburg v. Sec'y of Health Human Servs.,740 F.2d 100, 105-06 (1st Cir. 1984)).
Moreover, it is well-established that a higher level of deference is owed when reviewing agency determinations of matters within the agency's specialized expertise. See Rhode IslandHigher Educ. Assistance Auth. v. Sec'y, U.S. Dep't of Educ.,
929, 844, 857 (1st Cir. 1991) (citing Lile v. Univ. of IowaHosps. and Clinics, 886 F.2d 157, 160 (8th Cir. 1989);Bldg. and Const. Trades Dep't, AFL-CIO v. Brock, 838 F.2d 1258,1266 (D.C. Cir. 1988)) ("[i]t is apodictic that a reviewing court should accord an agency's decision considerable deference when that decision involves a technical question within the field of the agency's expertise"). Accordingly, when an agency purports to interpret a rule or statute outside the purview of its expertise, the deference afforded need not be as broad. See Burns v.Sundlun, 617 A.2d 114, 117 (R.I. 1992) (rejecting request for remand to exhaust administrative remedies when the "question raised by plaintiff is a question of statutory interpretation outside the agency's area of expertise").
 AGENCY APPEAL
Heath alleges that the Decision by RIDEM was made upon unlawful procedure and, consequently, that the Decision was in violation of statutory provisions and clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. Heath claims it has had substantial rights prejudiced as a result. Accordingly, Heath now asks this Court to reverse the Decision.
 Judicial Review of Agency Interpretation
Prior to setting forth its substantive arguments, Plaintiff suggests that the underlying dispute is a matter of law thus necessitating that this Court utilize a de novo standard of review. It is well-established that questions of law generally fall outside the gambit of review available to administrative agencies. In re: Advisory Opinion to the Governor, 732 A.2d 55,60 (R.I. 1999) (whether ethics commission has "requisite authority" to promulgate particular regulations is a legal question and, therefore, reviewable de novo). While statutory construction is generally regarded as a legal question, seeCity of East Providence v. Public Utils. Comm'n, 566 A.2d 1305,1307 (R.I. 1989), when an administrative agency purports to interpret enabling legislation or its own regulations, such interpretation is entitled to a deferential review upon appeal to the Superior Court. See, e.g., Parkway Towers Assocs. v.Godfrey, 688 A.2d 1289, 1294 (R.I. 1997) (stressing that an agency's "administrative interpretation is entitled to great deference, especially when, as here, it is consistent with the overall purposes of the legislation"); Pawtucket Power Assocs.Ltd. P'ship, 622 A.2d at 456 ("deference will be accorded to an administrative agency when it interprets a statute whose administration and enforcement have been entrusted to the agency . . . even when the agency's interpretation is not the only permissible interpretation that could be applied"); Gallison v.Bristol Sch. Comm., 493 A.2d 164, 166 (R.I. 1985) ("where the provisions of a statute are unclear or subject to more than one reasonable interpretation, the construction given by the agency charged with its enforcement is entitled to weight and deference as long as that construction is not clearly erroneous or unauthorized").
In the case at bar, RIDEM interpreted the language of its ISDS Regulations and concluded that Heath, as the holder of development rights at Bonnet Shores, was not an "owner" in the context of the Regulations. As discussed above, "[o]ne of the most venerable doctrines in administrative law is that a court will give great deference to an agency's interpretation of its own rules." Charles H. Koch, Jr., Administrative Law andPractice, § 11.26 (2d Ed. 1997). This Court will afford the agency such deference.
 Agency Interpretation of Its Own Regulations
Heath claims that RIDEM, through AAD, employed an unlawful procedure in reaching its Decision. In support of its argument, Heath notes that AAD erroneously applied "the common meaning and usage of the term `legal title' to assess [Heath's] claim that it is an owner [of Bonnet Shores]." (Order at 6.) Plaintiff points to voluminous case law illustrating that the condominium form of ownership is a unique property regime. See, e.g., WoodsideVill. Condo. Assoc., Inc. v. Jahren, 806 So.2d 452, 455 (Fla. 2002) ("[c]ondominiums and the forms of ownership interests therein are strictly creatures of statute"). Therefore, Plaintiff contends, because the instant controversy concerns condominium property, AAD's reliance on the common meanings of "legal title" constituted an unlawful procedure.
Heath's argument in this context is not persuasive. The hearing officer did not make an error of law in considering the common meaning of the terms in the rules at issue. See Koch,Administrative Law And Practice at § 11.26[2][a] ("the plain meaning of the language governs unless expressed intent is to the contrary or the plain meaning would lead to an absurd result"). Moreover, this Court's review of the Order evidences that AAD relied on more than just the common meaning and usage of "legal title." Said Order references the Condominium Act, case law precedent, and policy considerations as additional bases for the agency's ultimate resolution. As such, the Decision was made upon lawful procedure.
 The Condominium Act
Additionally, Heath claims that the Decision was made in violation of the Condominium Act. It asserts that the language of the Act is such that it mandates Heath be deemed an "owner" of Bonnet Shores. First, Plaintiff points out that the Act assigns property tax obligations to a declarant holding development rights in common elements. See G.L. 1956 § 34-36.1-1.05(c). Additionally, Heath emphasizes the Commissioners' Comments following § 34-36.1-2.10, which emphasize the "unique interest in and control over the real estate" enjoyed by a declarant holding special development or withdrawal rights.[13] Moreover, Plaintiff claims that the alienability of said development rights, as expressly reserved within the Condominium Act, is another characteristic evidencing ownership. See G.L. 1956 §34-36.1-3.04. Finally, Heath suggests that definitions of "real estate" and "condominium," as prescribed in the Act, support its position.[14]
In 1982, the Rhode Island General Assembly adopted the Uniform Condominium Act, thereby creating in Rhode Island the condominium form of property ownership. See generally §§ 34-36-1 etseq. and 34-36.1-1 et seq.; see also Am. Condo. Ass'n,Inc., 844 A.2d at 1127. The Rhode Island version incorporated the language of the federal, and it was made applicable to all condominium units created after July 1, 1982. See G.L. 1956 §34-36.1-1.02(a)(1). Bonnet Shores was created in 1988 and therefore was created subject to the provisions of the Condominium Act. Heath claims that the instant Decision was made in violation of said statutory provisions.
There is no language in the statute incompatible with the agency's ultimate finding: that the holder of future development rights in a condominium does not have "legal title" to said property as within the context of the ISDS regulations. To the contrary, the Act is replete with language supporting AAD's conclusion. For example, the Commissioners' Comments to §34-36.1-2.10 provide that property subject to future development rights "for title purposes is a common element until [the rights are exercised]." Furthermore, the Commissioners' Comments to G.L. 1956 § 34-36.1-3.04 state that a declarant holding development rights "becomes the owner of any units created, but, prior to creation of units, the title to those portions of the condominium is in the unit owners." Accordingly, the Legislature intended for the unit owners to have vested legal title to all common areas, even those portions subject to development rights.See State v. Badessa, 869 A.2d 61, 65 (R.I. 2005) (citation omitted) ("in matters of statutory interpretation [the] ultimate goal is to give effect to the purpose of the act as intended by the legislature"). Consequently, the instant Decision was not contrary to the Condominium Act and, thus, was not made in violation of statutory provisions.
 The Condominium Declaration
Plaintiff also maintains that the Declaration, which was part of the record, supports its argument that the Decision was clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. Plaintiff notes that the Florida Supreme Court has referred to a declaration of condominium as follows:
 "[The declaration is] more than a mere contract spelling out mutual rights and obligations of the parties thereto-it assumes some of the attributes of a covenant running with the land, circumscribing the extent and limits of the enjoyment and use of real property. Stated otherwise, it spells out the true extent of the purchased, and thus granted, use interest therein." Woodside Vill. Condo. Ass'n,
806 A.2d at 456.
Plaintiff points out certain definitions found within the Declaration, thereby suggesting that the Decision was somehow contradictory to those definitions.[15]
Heath correctly asserts that the Declaration is akin to a contractual agreement. Generally, a condominium declaration is the instrument that "defines the rights as among the condominium owners, the condominium association, and the developer." Patrick Rohan Melvin Reskin, Real Estate Transactions: Condominium Lawand Practice, § 3.02 (2006). Yet Plaintiff's argument in this context fails in the same manner as did its argument relative to the statutory provisions: the language in the Declaration — as was the case with the language of the Condominium Act — does not demonstrate that the Decision was clearly erroneous.
Because the Declaration functions as a contract, this Court will apply contract principles upon reviewing said instrument.See, e.g., In re Rosteck, 899 F.2d 694, 696 (7th Cir. 1990); Johnson v. Fairfax Vill. Condo. IV Unit Owners Ass'n,548 A.2d 87, 91 (D.C. 1988) ("[t]he condominium instruments . . . are a contract that governs the legal rights between the Association and unit owners"). In reviewing ambiguity in contractual language, this Court will "view the agreement in [its] entirety and give the contractual language its `plain, ordinary and usual meaning.'" 1800 Smith St. Assocs., LP v.Gencarelli, 888 A.2d 46, 52 (R.I. 2005) (quoting Lajayi v. Fafiyebi, 860 A.2d 680, 686 (R.I. 2004)) (citation omitted). Thus, this Court will review the Declaration to determine whether the effect of the Decision was contrary to the intentions of the parties and, therefore, clearly erroneous in view of the substantial, reliable, and probative evidence on the record.
Article 20 of the Declaration reserves for the declarant the right to exercise its "Development Rights" within 20 years of the instrument's date of execution. (Declaration at 53, 58.) The Declaration contains language regarding the parameters within which said development rights may be exercised.[16]
However, pertinent to the Heath's argument herein, the language is noticeably silent as to the status of the property right held by the declarant prior to exercising the development right. As such, there is nothing in the Declaration which would render clearly erroneous RIDEM's determination that Heath, as holder of said development rights, was not an "owner" of Bonnet Shores as per the agency's ISDS Regulations.[17]
Moreover, the Declaration provides that the Association has "[t]he power to apply for, hold and maintain any and all licenses and permits necessary and/or desirable for the operation and maintenance of the beach club." (Declaration at 32.) Again, the above language is markedly silent relative to development rights or special declarant rights. Accordingly, the Declaration authorizes the Association to manage Bonnet Shores and specifically affords it the right to apply for permits such as that at issue before this Court. As such, the Decision was not clearly erroneous in view of the Declaration.
 Policy Considerations
Plaintiff also claims that AAD's conclusions with respect to the relevant policy considerations were clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. Heath submits that, contrary to what is prescribed in the Decision, the policy concerns of RIDEM are compatible with labeling plaintiff an "owner" on the instant facts. Plaintiff's argument in this context is predicated on the assertion that condominium ownership is a unique property scheme and that expanding the ownership interest therein to include holder of special development rights would not frustrate the intent of the ISDS Regulations as AAD.
When an agency purports to interpret its own rules or regulations, "the statement of basis and purpose must be a major aid to [said] interpretation." Koch, Administrative Law andPractice at § 11.26[2](c). The ISDS Regulations provide the following with respect to the agency's underlying policy aspirations:
 "Whereas, the Environmental Standards Board and the Director of the Department of Environmental Management have been delegated authority by Chapters 42-17.1, 46-12 and 5-56 of the General Laws of the Rhode Island, 1956, as amended, and
 Whereas, the people of the State should be assured that adequate and sanitary individual sewage disposal facilities have been and are being provided and maintained for all dwellings and buildings not served by public sewage systems, and
 Whereas, the public health may be imperiled by the diseases and other health hazards which may result from the improper treatment or discharge of sanitary sewage, and
 Whereas, the public health and interest may be harmed by contamination of ground water aquifers which are now used and which may be used as sources of public water supply which can result from the improper location, design, construction and maintenance of individual sewage disposal systems, and
 Whereas, the public health and interest may be harmed by contamination of drinking water wells and other water supplies or tributaries thereto which has and can result from improper location, design, construction or maintenance of individual sewage disposal systems, and
 Whereas, freshwater and coastal waters of the State may be imperiled by high nutrient and bacteriological contamination that has and can result from improper treatment or discharge of sanitary sewage, and
 Whereas, the people of the State may be inconvenienced or harmed by nuisance conditions such as odors and overflows that have and can result from improper location, design, construction or maintenance of individual sewage disposal systems, and
 Whereas, the public use and enjoyment of the recreational resources of the State may be disrupted or imperiled by contamination of those resources which has and can result from improper location, design, construction and maintenance of individual sewage disposal systems, therefore
. . . .
 It is the policy of the Department of Environmental Management to assure the proper location, design, construction and maintenance of individual sewage disposal systems. The public health and environmental quality and public interest of this State requires that the hereinstated regulations be promulgated and enforced pursuant to the authority of the General Laws. These regulations are designed to provide minimum standards for the location, design, construction and maintenance of individual sewage disposal systems." ISDS Regulations at 7-8.
In light of RIDEM's unequivocal policy of sustaining environmental heath and public well-being in Rhode Island, AAD concluded that the agency's mandate "would be frustrated by the broad interpretation of owner urged by [Heath]." (Order at 7.) Consequently, the findings are supported by reliable, probative, and substantial evidence on the whole record.
 CONCLUSION
Upon review of the whole record, the Court finds that the Decision by RIDEM was made upon lawful procedure; was not made in violation of statutory provisions; and was not clearly erroneous in view of the reliable, probative, and substantial evidence on the record. Substantial rights of the Plaintiff have not been prejudiced. For the foregoing reasons, the Court hereby affirms the Decision adopted by RIDEM. Counsel shall submit an appropriate judgment consistent with this opinion.
[1] Rhode Island adopted the Uniform Condominium Act in 1982.See infra, at 10-12; see also Am. Condo. Ass'n, Inc. v.IDC, Inc., 844 A.2d 117, 127 (R.I. 2004).
[2] The ISDS Regulations set forth specific policy objectives and procedural requirements pertaining to the application for sewage disposal system permits and to the requirements for system maintenance. See generally ISDS Regulations.
[3] General Laws Section 34-36.1-1.03(26) defines "[s]pecial declarant rights" as "rights reserved for the benefit of a declarant to [inter alia] exercise any development right." General Laws Section 34-36.1-1.03(11) defines "[d]evelopment rights" as "any right or combination of rights reserved by a declarant in the declaration to: (A) [a]dd real estate to a condominium, (B) [c]reate units, common elements, or limited common elements within a condominium, (C) [s]ubdivide units or convert units into common elements, or (D) [w]ithdraw real estate from a condominium." Additionally, with respect to the particular declaration, G.L. 1956 § 34-36.1-2.05(a)(8) provides that the declaration must include a "description of any development rights and other special declarant rights . . . reserved by the declarant, together with a legally sufficient description of the real estate to which each of those rights applies, and a time limit within which each of those rights must be exercised."
[4] See G.L. 1956 § 42.17.1-2(t)-(v) (authorizing DEM to conduct investigations, issue compliance orders, and impose administrative penalties for noncompliance).
[5] See Memorandum of OWR Opposing Heath's Request for Declaratory Ruling at Exhibit 2, ISDS Permit No. 0220-2924. The Declaration defines "common elements" as those "portions of the Condominium Property which are not included within the Units" as well as "[a]ny other parts of the Condominium Property designated as Common elements . . . by the provisions of the Condominium Act." (Declaration at 2.)
[6] The record reveals that 938 condominium units currently exist at Bonnet Shores reflecting an inconsistency between the requirement set forth in the permit, as noted above, and the actual number of units constructed.
[7] See Memorandum of Law in Support of Heath's Petition for Declaratory Ruling at 3; See also ISDS Rule 22.01, 22.02, and 22.03 (setting forth the appellate procedcure available for aggrieved parties in the ISDS permitting process); see also
AAD Rule 5.0 (defining "timely filing" with the AAD).
[8] General Laws Section 42-35-8 provides the following:
 "Declaratory rulings by agencies. — Each agency shall provide by rule for the filing and prompt disposition of petitions for declaratory rulings as to the applicability of any statutory provision or of any rule or order of the agency. Rulings disposing of petitions have the same status as agency orders in contested cases."
[9] The Declaration allows for construction of a maximum of 1625 units subject to development rights or withdrawal rights and specifies that the entire project shall consist of no more than 1737 units. (Declaration at 57.) Accordingly, the Declaration authorizes a larger number of units than do the ISDS permits — both the original permit and the newly issued permit at issue in this proceeding. However, neither party has raised the discrepancy, and, as such, the issue is moot for the purposes of the instant appeal.
[10] Order at 10. See also Envtl. Scientific Corp. v.Durfee, 621 A.2d 200, 207-08 (R.I. 1993) (describing the two-tiered review employed by certain agencies and analogizing said review to a "funnellike system" wherein this Court will afford a high level of deference upon review).
[11] As noted supra, declaratory rulings made pursuant to §42-35-8 are deemed final agency orders in contested cases and, therefore, are appealable under the auspices of Administrative Procures Act. See §§ 42-35-8 and 42-35-15.
[12] Super. Ct. R. Civ. P. 24(a)(2) provides the following:
 "[A]nyone shall be permitted to intervene in an action . . . when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."
[13] G.L. 1956 § 34-36.1-2.10, Commissioners' Comment 4. Upon establishing the Condominium Act, the General Assembly authorized the secretary of state to insert official commentary, referred to as Commissioners' Comments, following each provision as deemed necessary. "Unless the statutory language clearly and expressly states otherwise, those comments are to be used as guidance concerning legislative intent in adopting the chapter." Am.Condo. Assoc., Inc., 844 A.2d at 127; see also Compiler's Notes to G.L. 1956 § 34-36.1-1.01 (citing P.L. 1982, ch. 329, § 3).
[14] General Law Section 34-36.1-1.03(24) defines "[r]eal estate" as "any leasehold or other estate or interest in, over, or under land, including structures, fixtures, and other improvements and interests which by custom, usage or law pass with a conveyance of land. . . . `Real estate' includes parcels with or without upper or lower boundaries, and spaces that may be filled with air or water." General Law Section 34-36.1-1.03(7)(i) defines "[c]ondominium" as "real estate, portions of which are designated for separate ownership and the remainder of which is designated for common ownership solely by the owners of those portions. Real estate is not a condominium unless the undivided interests in the common elements are vested in the unit owners."
[15] Heath notes that the Declaration defines "Common Elements" as "the portions of the Condominium Property which are not included within the Units." (Declaration at 2.) Additionally, Heath references the definition of "Condominium Property" as "the Land, all Buildings and improvements on or servicing the Land, and all easements and rights appurtenant thereto intended for use in connection with the Condominium, and all other property, real, personal, and mixed, which may subsequently be made subject to this Declaration as hereinafter described." Id.
[16] The Declaration provides that the rights held by the declarant are freely alienable. (Declaration at 54, 61.) In addition, the Declaration permits the declarant to maintain an office on the property and take other action it deems appropriate relative to exercising the development rights. Id. at 55. The document also provides that the declarant may use the development right to add condominium units or common area to the property and that the declarant may exercise the right at "different times with respect to different parcels of real estate." Id. at 55, 58.
[17] Moreover, while Plaintiff claims that the underlying dispute represents "just another attempt by the Association to frustrate Heath's exercise of its rights concerning the [d]eclarant units," (Heath's Memorandum of Law in Support of Its Appeal at 3) it is important to note that the instant Decision does not eradicate Heath's right to develop additional units at Bonnet Shores. Rather, Plaintiff may freely exercise said right so long as it does so in a manner that will comply with RIDEM's Regulations.